# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**JANIE DOE,** *by her next friends and parents,*
*JILL DOE and JOHN DOE,*

                    **Plaintiff,**

          **v.**                                                         **Civil Action No. 3:24cv493**

**HANOVER COUNTY SCHOOL BOARD,**
*et al.,*

                    **Defendants.**

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Plaintiff Janie Doe's Motion for Preliminary Injunction (the "Motion"). (ECF No. 13.)[1] Defendants Hanover County School Board (the "School Board" or the "Board"), Robert J. May, in his official capacity as Chair of the Hanover County School Board, and Lisa Pennycuff,[2] in her official capacity as Interim Superintendent of the Hanover County School Board (collectively, the "Defendants") responded in opposition to the Motion, (ECF No. 34), and Janie Doe replied, (ECF No. 50). On August 14, 2024, the Court heard oral argument on the Motion. The matter is ripe for disposition.

For the reasons articulated below, the Court will grant the Motion for Preliminary Injunction. (ECF No. 13.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

[2] Michael B. Gill served as the Superintendent of Hanover County Public Schools from December 2015 until August 1, 2024, and was initially named as a Defendant in this suit. (ECF No. 52 ¶ 10; *see* ECF No. 1.) Effective August 5, 2024, Lisa Pennycuff serves as the Interim Superintendent of Hanover County Public Schools. (ECF No. 52 ¶ 10.) Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she has been substituted for Superintendent Michael B. Gill as Defendant in this action.

### I. Factual and Procedural Background

**A.**    **Factual Background**

    **1.**    **Janie's Gender Identity, Gender Dysphoria Treatment, and Transition[3]**

Janie Doe is an eleven-year-old girl "who is transgender, which means she is a girl who was assigned the sex of male at birth." (ECF No. 14, at 10 (citing ECF No. 16 (hereinafter "Janie Decl.") ¶ 4; ECF No. 17 (hereinafter "Jill Decl.") ¶ 5; ECF No. 18 (hereinafter "John Decl.") ¶ 5); ECF No. 52 ¶¶ 1, 3.) "Janie has known from a young age that she is a girl." (ECF No. 14, at 11 (citing Janie Decl. ¶¶ 4–5; Jill Decl. ¶¶ 5–6; John Decl. ¶¶ 5–6).) Since the autumn of 2020, "when Janie was seven years old, she has asserted a definitive preference for she/her pronouns and [has] presented as a girl to her family, friends, and school." (ECF No. 14, at 12 (citing Janie Decl. ¶ 5; Jill Decl. ¶¶ 5–6; John Decl. ¶¶ 5–6); ECF No. 52 ¶ 4.) In 2021, when Janie was seven or eight years old, she changed her legal name, and "the Virginia Department of Health issued a birth certificate reflecting Janie's sex as female." (ECF No. 14, at 12 (citing Jill Decl. ¶ 8; John Decl. ¶ 8); ECF No. 52 ¶ 6.) "Janie attends a middle school within Hanover County Public Schools." (ECF No. 52 ¶ 2.)

---

[3] For a definition of terms such as gender identity, gender dysphoria, cisgender, etc., the Court refers to the meticulously researched and written opinion in *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594–97 (4th Cir. 2020).

    "Gender identity" means one's "deeply felt, inherent sense" of one's gender. *Id.* at 594.

    "Gender dysphoria" means "the clinically significant distress that results from 'a marked incongruence between one's experienced/expressed gender and their assigned gender' at birth." (ECF No. 52. ¶ 11.)

    "Cisgender" describes a person whose gender identity "aligns with their sex-assigned-at-birth." *Grimm*, 972 F.3d at 594.

"In August 2020, Janie established care with a clinical psychologist who specializes in caring for transgender individuals." (ECF No. 14, at 11 (citing Janie Decl. ¶¶ 6–7; Jill Decl. ¶ 7; John Decl. ¶ 7).) Since the fall of 2020, when Janie was seven, she "attended school as a girl and used her first name . . . that aligns with her gender identity," (Jill Decl. ¶ 6; John Decl. ¶ 6), which made her "very happy," (Janie Decl. ¶ 5). One year later, in August 2021—"following a year-long evaluation that included meeting with Janie, her parents, and her brother[—]the psychologist diagnosed Janie with gender dysphoria." (ECF No. 14, at 11 (citing Janie Decl. ¶¶ 6–8; Jill Decl. ¶ 7; John Decl. ¶ 7); ECF No. 52 ¶ 12.) The clinical psychologist "opined that puberty blockers would be indicated when Janie reached the appropriate stage of puberty." (ECF No. 52 ¶ 12.) "In May 2022, Janie established care with a pediatric endocrinologist who confirmed [the diagnosis of gender dysphoria]." (ECF No. 14, at 11 (citing Janie Decl. ¶ 9; Jill Decl. ¶ 9; John Decl. ¶ 9); ECF No. 52 ¶ 13.)   In September 2022, when Janie was nine years old, she received a histrelin implant. (ECF No. 14, at 12 (citing Janie Decl. ¶ 10; Jill Decl. ¶ 10; John Decl. ¶ 10); ECF No. 52 ¶ 14.) This implant "suppresses her endogenous hormones and prevents further development of puberty associated with testosterone." (ECF No. 14, at 12 (citing Janie Decl. ¶ 10; Jill Decl. ¶ 10; John Decl. ¶ 10); ECF No. 52 ¶ 14.) Janie explains that the implant "stops [her] from going through puberty as a boy." (Janie Decl. ¶ 10.) "Janie remains on puberty blockers today; the original implant was replaced in February 2024, in accordance with Janie's treatment schedule." (ECF No. 52 ¶ 14.)

### 2.   Janie's Love of Tennis and the School Board's 2023 Decision to Exclude Janie From Her Middle School's Girls' Tennis Team

Janie loves to play tennis. (ECF No. 14, at 12 (citing Janie Decl. ¶¶ 3, 17).) She wants to play "alongside her classmates and wear her school's uniform." (ECF No. 14, at 12 (citing Janie Decl. ¶¶ 12, 20–21).) The only way for Janie to play tennis for her school is for her to play on

the girls' team because anything else would deny Janie's "gender identity and undermine[] her gender-affirming medical treatment." (ECF No. 14, at 13 (citing Janie Decl. ¶¶ 19–20; Jill Decl. ¶ 25; John Decl. ¶ 25).)  On or about August 29 and 31, 2023, Janie tried out for the girls' tennis team at her middle school and on August 31, 2023, found out that she was selected to join the team. (ECF No. 14, at 14 (citing Janie Decl. ¶ 12; Jill Decl. ¶¶ 13–14; John Decl. ¶¶ 13–14); ECF No. 52 ¶¶ 15–16.)

Janie's celebration was short-lived.  On September 5, 2023, her parents received a letter from School Board Chair May explaining that the School Board had learned that "Janie was 'born male' and requesting 'medical documentation or verification' of Janie's 'consistent expression as female.'" (ECF No. 14, at 14 (citing ECF No. 15-1 (hereinafter the "September 5, 2023 Letter"), at 1); ECF No. 52 ¶ 17.)  The letter stated that the request came "[i]n light of the recently released *Virginia Department of Education's Model Policies on Ensuring Privacy, Dignity and Respect for all Students and Parents in Virginia's Public Schools*, the Attorney General's opinion issued August 23, 2023 on this issue, and [the School Board's] current practice for middle school transgender athletes." (September 5, 2023 Letter, at 1.)  Mr. May advised that Janie would "not be permitted to participate in practices or matches" until the School Board reached a decision. (September 5, 2023 Letter, at 1.)

On September 11 and 12, 2023, Jill and John Doe submitted documentation to the School Board evidencing Janie's gender dysphoria diagnosis and treatment. (ECF No. 14, at 14 (citing Jill Decl. ¶ 19; John Decl. ¶ 18); ECF No. 52 ¶ 18.)  On September 14, 2023, Jill and John Doe received a four-sentence letter from School Board Chair May informing them that "the School Board voted unanimously against permitting [Janie] to participate on the middle school girls'

tennis team in [an] effort to ensure fairness in competition for all participants." (ECF No. 14, at 14 (citing ECF No. 15-2 (hereinafter the "September 14, 2023 Letter"), at 1); ECF No. 52 ¶ 19.)

Janie was "angry," "embarrassed," and "devastated" by the decision. (Janie Decl. ¶ 16; Jill Decl. ¶ 22; John Decl. ¶ 21.) She was particularly upset that she "would not be allowed to play tennis with her friends and represent her school at matches." (Jill Decl. ¶ 22; John Decl. ¶ 21.)

Janie subsequently sought other opportunities outside of Hanover County Public Schools to participate in athletics. (ECF No. 14, at 15 (citing Janie Decl. ¶ 17; Jill Decl. ¶ 27; John Decl. ¶ 27).) Specifically, in the spring of 2024, Janie participated in a private competitive tennis program where she was able to participate in accordance with her gender identity. (ECF No. 14, at 16 (citing Jill Decl. ¶ 27; John Decl. ¶ 27).) This program entailed "greater expense and logistical burden than was required for participation on the school team." (ECF No. 14, at 16 (citing Jill Dec. ¶ 27; John Decl. ¶ 27).)

### 3.    The Virginia Department of Education Model Policies and the School Board's Updated Policy Regarding Participation in Extracurricular Activities

In 2020, three years before Janie's 2023 tryout, the General Assembly enacted Virginia Code § 22.1-23.3, which directed the Virginia Department of Education ("VDOE") to

> develop and make available to each school board model policies concerning the treatment of transgender students in public elementary and secondary schools that addresses common issues regarding transgender students in accordance with evidence-based best practices and include information, guidance, procedures, and standards relating to [several matters].

Va. Code § 22.1-23.3(A). Section 22.1-23.3(B) requires that school boards "adopt policies that are consistent with but may be more comprehensive than the model policies developed by the [VDOE] pursuant to subsection A." Va. Code § 22.1-23.3(B).

On July 18, 2023, the VDOE published the Model Policies on Ensuring Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools ("2023 Model Policies" or the "Model Policies"). (ECF No. 34-1 (hereinafter "2023 Model Policies")); *see also Model Policies on Ensuring Privacy, Dignity, and Respect for All Students and Parents in Virginia's Public Schools*, Va. Dep't of Educ. (July 18, 2023), available at https://www.doe.virginia.gov/parents-students/for-parents/model-policies-on-ensuring-privacy-dignity-and-respect-for-all-students-and-parents-in-virginia-s-public-schools (last accessed Aug. 9, 2024).  With respect to athletics, the 2023 Model Policies state:

> For any athletic program or activity that is separated by sex, the appropriate participation of students shall be determined by sex rather than gender or gender identity.  [School Division] shall provide reasonable modifications to this policy only to the extent required by law.

(2023 Model Policies, at 16 (alteration in original).)  The 2023 Model Policies define sex as "biological sex."  (2023 Model Policies, at 5.)

On August 23, 2023, Virginia Attorney General Jason Miyares issued an Advisory Opinion concluding that the 2023 Model Policies' guidance on athletics complied with, as relevant here, the Equal Protection Clause and Title IX.  (ECF No. 34-2, at 3–6.)

On November 14, 2023, the School Board unanimously voted to revise its policy governing extracurricular activities.  (ECF No. 14, at 15 (citing ECF No. 15-4, at 4); ECF No. 52 ¶ 20.)  The School Board added the following paragraph to its extracurricular activities policy:

> For any school programs, events, or activities (including extracurricular activities) that are separated by biological sex, the appropriate participation of students will be determined by biological sex rather than gender or gender identity. . . . Reasonable modifications to this policy will be permitted only to the extent required by law.

(ECF No. 15-5, at 1 (Policy Manual § 7-4.1 (2023))) (hereinafter, the "Policy").)

6

### 4.    The 2024 Tennis Tryout

Janie still wants "to play tennis with her friends and represent her school." (ECF No. 14, at 16 (citing Janie Decl. ¶ 17; Jill Decl. ¶ 28–29; John Decl. ¶ 28–29).) Janie asked her parents if she could play on her school's girls' tennis team this coming year. (Janie Decl. ¶ 18; Jill Decl. ¶ 29; John Decl. ¶ 29.) "On May 24, 2024, Janie's parents, through counsel, asked the School Board whether Janie would be allowed to participate on the middle school girls' tennis team in Fall 2024." (ECF No. 52 ¶ 22.) On June 12, 2024, Hanover County legal counsel notified counsel for Janie's parents "that the School Board would consider a renewed request" for Janie to try out for and participate on the girls' tennis team and "directed Janie's parents to submit a formal request with supporting documentation for its reconsideration in a closed session at an upcoming meeting." (ECF No. 34, at 3 (citing ECF No. 34-3 (hereinafter, the "June 21, 2024 Letter")); ECF No. 52 ¶ 23.) On June 21, 2024, Janie's parents submitted a letter to the School Board renewing their request that Janie be allowed to participate on the girls' tennis team in the autumn of 2024. (ECF No. 14, at 16 (citing Jill Decl. ¶ 31; John Decl. ¶ 31); ECF No. 52 ¶ 24.) Along with the letter, their submission included: (1) a June 20, 2024 letter from Janie's physician stating that Janie was under continuing care and met the diagnostic criteria for gender dysphoria; (2) a copy of the United States Court of Appeals for the Fourth Circuit's April 16, 2024 decision in *B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024), *petition for cert. filed*, Nos. 24-43, 24-44 (July 16, 2024); and, (3) a reference to the documents previously submitted in September 2023. (ECF No. 34, at 3–4 (citing June 21, 2024 Letter); ECF No. 52 ¶ 24.)

The Does expected the School Board to consider Janie's renewed request at its July 9, 2024 meeting. (ECF No. 14, at 17 (citing Jill Decl. ¶ 32; John Decl. ¶ 32).) On July 9, 2024, the

School Board discussed the request but deferred a decision until its August 13, 2024 meeting. (ECF No. 34, at 4 (citing Hanover Cnty. Bd. & Comm. Meeting Pub. Portal, *Hanover County School Board July 9, 2024 Meeting*, http://hanovercova.portal.civicclerk.com/event/ 1055/media, at 00:58–02:31, 02:47:50–02:48:02); ECF No. 52 ¶ 25.)  At oral argument, defense counsel explained that the Board was not prepared to decide this issue at that time because two new Board members had begun their terms just eight days prior on July 1, 2024.

Tryouts for the girls' tennis team at Janie's middle school are expected to take place during the week of August 26, 2024.  (ECF No. 14, at 16 (stating "late August 2024") (citing Jill Decl. ¶ 33; John Decl. ¶ 33); ECF No. 52 ¶ 27.)

**5.      The School Board's August 13, 2024 Denial of Janie's Request to Play Girls' Tennis**

On August 13, 2024, the School Board denied Janie's request to play on the girls' tennis team by a vote of five to one.

That same day, the School Board sent a letter to Janie's parents explaining the rationale for the decision.  (ECF No. 60 (the "August 13, 2024 Letter").)  The August 13, 2024 Letter first states that the School Board's Policy "conform[s] to the Model Policies as required by state law." (ECF No. 60, at 1.)

Second, in considering whether Janie's case warranted an exception required by law, the August 13, 2024 Letter cites to Attorney General Miyares's official advisory opinion, which takes the position that the 2023 Model Policies comply with the Equal Protection Clause, Title IX, and the Virginia Human Rights Act.  (ECF No. 61, at 2.)

8

Third, the letter represents that the Board "discussed whether the facts of [*B.P.J.*][4] dictate that [Janie] be eligible for the middle school girls' tennis team." (ECF No. 61, at 3.) The School Board notes that "a petition for a writ of certiorari has been filed with the Supreme Court of the United States in *B.P.J.*, which means that the decision may be affirmed, reversed, or modified in the future." (ECF No. 61, at 3.)

Fourth, the August 13, 2024 Letter cites "[o]ther ongoing lawsuits and regulatory actions, that leave open the question of whether Title IX requires school divisions to use gender identity, rather than biological sex, to determine eligibility for athletics[.]" (ECF No. 61, at 3.)[5]

The Board states that, "[u]ntil a court determines that Section 22.1-23.3 of the Code of Virginia, the Model Policies, or the Opinion of the Attorney General are invalid, the School Board is confronted with a situation where state law **requires** that it adopt and implement the Model Policies." (ECF No. 60, at 3–4 (emphasis in original).)[6]

---

[4] *B.P.J. v. W. V. State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024) (binding Fourth Circuit case law involving a transgender girl plaintiff who sought to compete on her middle's girls' track team, determining that a West Virginia statute preventing transgender girls from playing on girls' athletic teams violated Title IX as applied to the plaintiff, and finding that summary judgment in favor of the defendants on the equal protection claim was unwarranted).

[5] Of course, these lawsuits and regulatory actions are of limited relevance here, where Janie Doe does not seek to require her school division "to use gender identity, rather than biological sex, to determine eligibility for athletics." (*See* ECF No. 61, at 3.) She seeks only that the Board grant her a reasonable modification to its existing policy, which determines eligibility for athletics based on biological sex rather than gender identity.

[6] Here, the Board seems to conflate the requirement that it adopt a policy consistent with the Model Policies with the discrete obligation, included in the Policy itself, that the Board allow reasonable modifications to the extent required by law. That Hanover County is required to adopt a policy that conforms with the Model Policies is not in issue here; rather, it is the Board's application of the Policy in Janie's case and its determination that Title IX and the Equal Protection Clause do not direct an exception to the Policy in her particular case.

9

### B.    Procedural Background

On July 3, 2024, Janie Doe filed a two-count Complaint alleging deprivation of equal

protection, in violation of the Equal Protection Clause of the Fourteenth Amendment, and

violation of Title IX, 20 U.S.C. § 1681 *et seq.*  (ECF No. 1 ¶¶ 92–107.)

Also on July 3, 2024, Janie Doe filed the instant Motion for Preliminary Injunction.

(ECF No. 13.)  On July 22, 2024, the Defendants responded, (ECF No. 34), and on July 29,

2024, Janie Doe replied, (ECF No. 50).  On August 14, 2024, the Court heard oral argument on

the Motion.  The matter is ripe for disposition.

## II.  Legal Standard:  Preliminary Injunction

"Federal Rule of Civil Procedure 65 authorizes federal courts to issue temporary

restraining orders and preliminary injunctions." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728

(E.D. Va. 2017).  "A preliminary injunction is 'an extraordinary remedy that may only be

awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Perry v. Judd*, 471 F.

App'x 219, 223 (4th Cir. 2012) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22

(2008)).  Such remedy is "never awarded as of right." *Winter*, 555 U.S. at 24.  "[G]ranting a

preliminary injunction requires that a district court, acting on an incomplete record, order a party

to act, or refrain from acting, in a certain way." *Hughes Network Sys. v. InterDigital Commc'ns

Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (citation omitted).  Therefore, preliminary injunctions

are "to be granted only sparingly." *Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 590–91 (E.D.

Va. 2008) (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524 (4th Cir. 2003)).

"[T]o be eligible for a preliminary injunction, the party seeking such relief must

demonstrate each of the following factors:  (1) the likelihood of success on the merits; (2) the

likelihood of irreparable harm in the absence of preliminary injunctive relief; (3) the balance of

equities between the parties tips in favor of the party seeking such relief; and, (4) the public

interest." *Parson v. Alcorn*, 157 F. Supp. 3d 479, 491 (E.D. Va. 2016) (footnote omitted) (citing

*Winter*, 555 U.S. at 20; *Real Truth About Obama, Inc. v. Fed. Election Comm'n ("Real Truth")*,

575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in*

*relevant part*, 607 F.3d 355 (4th Cir. 2010)). "Where, as here, the government is a party, the

'balance of the equities' and 'public interest' prongs of the preliminary injunction test merge."

*B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347, 357 (S.D. W. Va. 2021) (quoting *Nken*

*v. Holder*, 556 U.S. 418, 435 (2009)).

The party seeking a preliminary injunction bears the burden of establishing that each

factor supports granting the injunction. *Real Truth*, 575 F.3d at 346. The proponent must

demonstrate each factor by a "clear showing." *Winter*, 555 U.S. at 22. The failure to show any

one of the relevant factors mandates denial of the preliminary injunction. *Real Truth*, 575 F.3d

at 346.

### III.  Analysis

**A.    Janie Doe Has Standing to Bring This Case and Her Claims Are Ripe for This Court's Review**

Defendants' opposition brief argues that Janie lacks standing and that her case is not ripe

based on the fact that, at the time Defendants filed their opposition brief, the School Board had

not yet issued a decision on Janie's application.  (ECF No. 34, at 4–7.)  On August 13, 2024, the

Board issued its decision denying her application.  At oral argument on August 14, 2024, the

Defendants conceded that Janie has standing and that her claim is now ripe for judicial review.

Accordingly, the Court turns to the merits of the preliminary injunction motion.

**B.      A Preliminary Injunction Is Warranted Because Janie Doe Has Satisfied All Four *Winter* Factors**

Janie has made a clear showing that each of the *Winter* factors favors granting preliminary injunctive relief.  First, Janie has clearly shown a likelihood of success on the merits of both her Title IX claim and her equal protection claim.  Second, Janie has clearly shown the likelihood of irreparable harm in the absence of preliminary injunctive relief.  Finally, Janie has clearly shown that both the balance of equities and the public interest favor granting her requested preliminary injunctive relief.  Because Janie has made a clear showing that each of the *Winter* factors favors granting a preliminary injunction, the Court will grant her Motion.  (ECF No. 13.)

**1.      Janie Doe Has Demonstrated a Likelihood of Success on the Merits**

Janie brings two counts:  (1) deprivation of equal protection, in violation of the Fourteenth Amendment to the United States Constitution; and, (2) violation of Title IX, 20 U.S.C. § 1681 *et seq*.  (ECF No. 1 ¶¶ 92–107.)  Janie has made a clear showing of a likelihood of success on the merits as to both her claims.  The Court addresses both claims, beginning with Title IX.

**a.      Title IX Claim**

Janie has made a clear showing that she is likely to succeed on the merits of her Title IX claim.  First, Janie has established that the Board excluded her, on the basis of sex, from participating in an education program when it denied her application to try out for (and if selected, to participate on) her school's girls' tennis team based on her gender identity.  *See* *B.P.J.*, 98 F.4th at 563.  Second, Hanover County Public Schools were receiving federal financial assistance at the time the Board denied Janie's application.  Third, Janie has shown that the

12

denial harmed her.  Further, Janie has made a clear showing that the sex-based discrimination that Janie has demonstrated treats her worse than others who are similarly situated.

### i.      Legal Standard:  Title IX

Title IX of the Education Amendments of 1972 states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  To state a claim under Title IX, a plaintiff must demonstrate "that (1) he [or she] was excluded from participation in an education program "on the basis of sex"; (2) that the educational institution was receiving federal financial assistance at the time; and[,] (3) that improper discrimination caused him [or her] harm." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020); *Peltier v. Charter Day Sch.*, 37 F.4th 104, 129 (4th Cir. 2022).  "Not every act of sex-based classification . . . show[s] legally relevant discrimination for purposes of Title IX." *B.P.J.*, 98 F.4th at 563.  "[U]nder Title IX, "discrimination 'mean[s] treating [an] individual *worse than* others who are similarly situated." *Id.* (quoting *Grimm*, 972 F.3d at 618 (alterations and emphasis in original)).  "[O]nce a Title IX plaintiff shows [he or] she has been discriminated against in the relevant sense and suffered harm, no showing of a substantial relationship to an important government interest can save an institution's discriminatory policy." *Id.*

### ii.      Defendants' Policy Excludes Janie on the Basis of Sex

Janie has made a clear showing that Defendants' Policy excludes Janie on the basis of sex.  To establish a Title IX claim, sex must have been a but-for cause of the discriminatory action. *See Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021) (collecting Supreme Court and Fourth Circuit cases interpreting "on the basis of sex" to require but-for

causation).  "[D]iscrimination based on gender identity is discrimination 'on the basis of sex' under Title IX."  *B.P.J.*, 98 F.4th at 563; 20 U.S.C. § 1681(a); *see also Grimm*, 972 F.3d at 616–17 (bathroom policies precluding a transgender teenager from using their preferred bathroom violated Title IX); *Kadel v. Folwell*, 100 F.4th 122, 163–64 (4th Cir. 2024) (gender identity discrimination violates the Affordable Care Act, which incorporates Title IX's antidiscrimination provision); *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049 (7th Cir. 2017) ("A policy that requires an individual to use a bathroom that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX."); *Soule v. Conn. Ass'n of Sch.*, 90 F.4th 34, 74 n.5 (2d Cir. 2023) (en banc) (Perez, J., concurring) ("Near-universal authority suggests that Title IX permits or even requires funding recipients to accommodate students who are transgender according to their gender identities.") (collecting cases).  This is so because "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex."  *Grimm*, 972 F.3d at 616 (quoting *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 659 (2020)).[7]  In such instances, the discriminator "necessarily refer[s] to the individual's sex to determine incongruence between sex and gender, making sex a but-for cause for the discriminator's actions."  *Id.*

---

[7] At oral argument, defense counsel suggested that the United States Supreme Court may soon take up the question of whether *Bostock*'s reasoning extends beyond the Title VII context in which it was decided.  In so doing, counsel cited *L.W. v. Skrmetti*, a case from the United States Court of Appeals for the Sixth Circuit, in which a petition for certiorari has been filed at the Supreme Court.

Neither the Sixth Circuit nor possible future decisions that counsel suggests reflect a "changing landscape" bind this Court.  Existing Fourth Circuit precedent applying *Bostock*'s reasoning beyond the Title VII context does.  *See B.P.J.*, 98 F.4th at 563; *Grimm*, 972 F.3d at 618.

14

The Hanover County extracurricular activities policy's requirement that an individual play on a sports team "that does not conform with his or her gender identity punishes that individual for his or her gender non-conformance, which in turn violates Title IX." *See Whitaker by Whitaker*, 858 F.3d at 1049.

This discrimination treats Janie worse than others who are similarly situated. In *B.P.J.*, the Fourth Circuit found that an athletics policy forbidding transgender girls from participating on the team that corresponded with their gender violated Title IX as applied to at least a subset of transgender girls because it categorically banned them from participating on sports teams consistent with their gender identities, "regardless of whether any given girl possesses any inherent athletic advantages based on being transgender." 98 F.4th at 563–64. Similarly, in *Grimm*, the Fourth Circuit concluded that a bathroom policy that prevented a transgender boy from using the boys' restroom violated Title IX. 972 F.3d at 616. In both cases, the court found it dispositive that the exclusionary policy could not be given effect without reference to the student's "biological gender," meaning their sex assigned at birth. *See id.* ("[T]he Board could not exclude Grimm from the boys bathrooms without referencing his 'biological gender' under the policy, which it has defined as the sex marker on his birth certificate."); *B.P.J.*, 98 F.4th at 563 ("The Act also discriminates based on sex assigned at birth" because it "forbids one—and only one—category of students from participating in sports teams 'corresponding with [their] gender': transgender girls.").

Here, too, the School Board's actions treat similarly situated students differently because of their gender identity. *See B.P.J.*, 98 F.4th at 563 (policies which "require[] treating students differently even when they are similarly situated" violate Title IX). The Policy turns on the biological sex of the student at birth, just as the policy in *B.P.J.* did. *Compare* Policy Manual

15

§ 7-4.1 ("[T]he appropriate participation of students will be determined by biological sex rather than gender or gender identity."), *with* W. Va. Code § 18-2-25d(b)(3) & (c)(2) (prohibiting "an individual whose biological sex determined at birth is male" from participating in "sports designated for . . . girls"). Transgender girls and cisgender girls are similarly situated in that they share a gender identity. Cisgender students may play on the team corresponding with their gender identity, but transgender students cannot. The different treatment turns on the transgender students' sex assigned at birth. The School Board cannot enforce its policy without referencing Janie's sex assigned at birth,[8] which renders sex a but-for cause of the School Board's decision to prohibit Janie from trying out for the girls' tennis team. *See Grimm*, 972 F.3d at 616.

Defendants argue that Janie is not similarly situated to other students who will try out for the girls' tennis team because she did not provide medical evidence to prove that she has not undergone the "Tanner 2"[9] stage of puberty, nor did she provide evidence of her levels of circulating testosterone. (ECF No. 34, at 10.) This appeal to speculative physiological dissimilarities is irrelevant to the Title IX claim. The inquiry that Title IX demands asks simply whether individuals have been treated differently on the basis of sex—which includes gender identity. *See B.P.J.*, 98 F.4th at 563 ("[D]iscrimination based on gender identity is

---

[8] This reality is especially troubling with respect to Janie because in 2021, the Virginia Department of Health issued her a birth certificate reflecting her sex as female. (Jill Decl. ¶ 8; John Decl. ¶ 8.) Two governmental entities have created documents espousing conflicting positions regarding Janie's sex.

[9] The "Tanner 2" stage of puberty marks the point at which sex-based differences, including increased levels of circulating testosterone and ability to build muscle mass, begin to develop. *B.P.J.*, 98 F.4th at 560–61.

16

discrimination 'on the basis of sex' under Title IX.").[10]  *B.P.J.* forecloses Defendants' argument

to the contrary.  *See id.* at 563–64.

That the Policy purports to apply equally to all students makes no difference, because

"Title IX protects the rights of individuals, not groups."  *See B.P.J.*, 98 F.4th at 565 (quoting

*Peltier*, 37 F.4th at 130).  The Policy "treats transgender girls differently from cisgender girls,

which is—literally—the definition of gender identity discrimination."  *See id.* at 556.  The

School Board's policy, applied to Janie, would "treat her worse than people to whom she is

similarly situated, deprive her of any meaningful athletic opportunities, and do so on the basis of

sex."  *Id.* at 565.  In this case, Janie has made a clear showing that she receives medical care in

the form of a histrelin implant which suppresses puberty associated with testosterone.  (ECF No.

52 ¶ 14.)  Despite having not undergone the Tanner 2 stage of puberty associated with

testosterone, the Board excluded her from participation in girls' athletics.

Defendants also argue that the case at bar is distinguishable from *B.P.J.* because here,

"there is no 'categorical bar' to Plaintiff trying out for and participating on the girls' 2024–2025

tennis team."  (ECF No. 34, at 9–10.)  However, the Court reads the Policy differently.  The

---

[10] However, even if the Court were to engage with this misplaced argument, it would note
that Janie has presented evidence that she has received a histrelin implant, which "suppresses her
endogenous hormones, testosterone, and prevents further development of puberty associated with
testosterone."  (ECF No. 52 ¶ 14.)  Further, no party has presented evidence that other
prospective team members had to provide any evidence whatsoever to justify their ability to try
out for the team.  Nor does the Policy state that the decision will turn on whether that student has
undergone the Tanner 2 stage of puberty or evinces a particular level of circulating testosterone.
Finally, no evidence exists that the Board ever *requested* such information from Janie.

Against this backdrop, this Court does not see how Janie's neglecting to provide yet
further private medical details in support of her application somehow makes her not similarly
situated to other students who did not have to provide *any* details to justify their participation on
the team that aligns with their gender identity.

Policy erects a "categorical bar" on transgender girls trying out for or playing on all girls' athletic teams, *unless* the Board approves their applications.[11]  In contrast, cisgender girls never need to submit an application to the Board before playing on girls' teams.  Like the ban in *B.P.J.*, the Policy thus treats transgender girls differently "on a categorical basis, regardless of whether any given girl possesses any inherent athletic advantages based on being transgender," by banning all transgender student-athletes from participating on the team that aligns with their gender identity—without special and apparently completely discretionary approval from the School Board. *See* 98 F.4th at 563.

The record before this Court underscores this lack of individualized inquiry.  The August 13, 2024 Letter explaining the Board's rationale for denying Janie's application states only that "[t]he School Board discussed whether the facts of the [*B.P.J.*] case dictate that your child be eligible for the middle school girls' tennis team."  (ECF No. 60, at 3.)  Although evidently the Board decided that *B.P.J.* did *not* dictate that Janie be permitted to play, it offered no basis for this conclusion.  The School Board noted only that "the decision [in *B.P.J.*] may be affirmed, reversed, or modified in the future,"[12] which does not constitute a basis for declining to follow its holdings at present.  (ECF No. 60, at 3.)  The August 13, 2024 Letter does not address Janie's

---

[11] Unlike the statute at issue in *B.P.J.*, the Policy here likewise categorically bars transgender boys from playing on the boys' sports teams, unless the Board approves their application.  The Court focuses on transgender girls because Janie Doe is a transgender girl who presents an as-applied challenge to the Policy.

[12] This statement is of course true of every opinion issued.  It does not alter the incontrovertibly binding nature of the *B.P.J.* decision.

To the extent the School Board included this as a basis for denying Janie's participation on the girls' tennis team notwithstanding binding Fourth Circuit precedent to the contrary, the Court rejects the possibility that future reversal or modification of existing precedent serves as a legitimate basis to deny Janie's application at present.

pubertal development, her levels of circulating testosterone, or any other indicator of purported competitive advantage. The sole determining factor and only relevant variable the Board rested its decision on was the simple fact of Janie's identity as a transgender girl, rather than any individualized or situational inquiry into factors that might impact fairness in competition, the stated rationale.

At oral argument, defense counsel added that the *B.P.J.* court expressly limited its holding to the facts of that case. *See B.P.J.*, 98 F.4th at 565 ("We do not hold that government officials are forbidden from creating separate sports teams for boys and girls or that they lack power to police the line drawn between those teams. We also do not hold that Title IX requires schools to allow every transgender girl to play on girls teams, regardless of whether they have gone through puberty and experienced elevated levels of circulating testosterone."). The Court does not understand Janie to ask that "every transgender girl [be allowed] to play on girls teams." *See id.* Like B.P.J., Janie brings an as-applied challenged and "seeks relief only insofar as this law applies to *her.*" *See B.P.J.*, 550 F. Supp. 3d 347, 352 (S.D. W. Va. 2021) (emphasis added).

Janie's case is strikingly similar to B.P.J.'s. Both B.P.J. and Janie are middle school transgender girls seeking to participate in non-contact girls' sports teams—in B.P.J.'s case, cross country and track, and in Janie's case, tennis. *See B.P.J.*, 550 F. Supp. 3d at 351; (ECF No. 52 ¶¶ 1, 3, 15, 22). Both B.P.J. and Janie "knew from a young age" that they were girls and, by third grade, had changed their names and outward presentations at school and at home to conform to their gender identities. *See B.P.J.*, 550 F. Supp. 3d at 351; (ECF No. 14, at 11 (citing Janie Decl. ¶¶ 4–5; Jill Decl. ¶¶ 5–6; John Decl. ¶¶ 5–6)). Both B.P.J. and Janie were diagnosed with gender dysphoria and began puberty-delaying treatment that prevents endogenous puberty. *See B.P.J.*, 550 F. Supp. 3d at 351; (ECF No. 14, at 11–12 (citing Janie Decl. ¶¶ 6–8, 10; Jill

19

Decl. ¶¶ 7, 9–10; John Decl. ¶¶ 7, 9–10)).  In both cases, the plaintiffs "aver[] that this treatment, which prevents endogenous puberty and therefore any physiological changes caused by increased testosterone circulation, prevents her from developing any physiological advantage over other girl athletes." *See B.P.J.*, 550 F. Supp. 3d at 351; (ECF No. 14, at 11 (citing Janie Decl. ¶ 10; Jill Decl. ¶ 10; John Decl. ¶ 10)).

The Court acknowledges that *B.P.J.* does not conclusively decide *every* case that *every* transgender girl might bring seeking to play on girls' sports teams.  The Court nonetheless finds *B.P.J.*'s reasoning deeply persuasive, at this preliminary stage, as to whether Janie clearly shows a likelihood of success on the merits given the numerous notable similarities between the facts of these two cases.

### iii.   Hanover County Public Schools Receive Federal Financial Assistance

The Fourth Circuit has applied Title IX to athletic programs which:  (1) receive funding directly or indirectly; or, (2) exert control over a program that receives such funding.  *See Peltier*, 37 F.4th at 127; *see also NCAA v. Smith*, 525 U.S. 459, 468 (1999) ("Entities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX[.]").  If any part of a school system receives federal funding, every aspect of the system's operations is subject to Title IX, including athletic programs.  *Alston v. Va. High Sch. League, Inc.*, 144 F. Supp. 2d 526, 533 (W.D. Va. 1999).

Hanover County Public Schools receive federal funding.  *See* Hanover Cnty. Sch. Bd., FY2024–2025 Adopted Budget 13 (May 14, 2024) (showing the school's district revenues from federal sources).  Thus, their athletic programs are subject to Title IX.  *See Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994) ("Congress has made clear" that Title IX extends to the "furthest reaches of an institution's programs") (finding an athletic association

20

subject to Title IX because it controlled the recipient athletic programs and received dues from participating schools). Defendants do not contest that Hanover County Public Schools receive federal financial assistance and were receiving such assistance when they denied Janie's application to play girls' tennis.

iv.     **Janie Has Suffered Harm Due to Defendants' Unlawful Discrimination**

A successful Title IX claim must establish "resulting harm" from the unequal treatment. *B.P.J.*, 98 F.4th at 563. Janie has demonstrated by a clear showing that she has suffered and will suffer medical, emotional, social, dignitary, and financial harm because of Defendants' discriminatory conduct.

With respect to medical harm, Janie has been diagnosed with gender dysphoria. (ECF No. 52 ¶ 12.) *See B.P.J.*, 98 F.4th at 564 ("The defendants cannot expect that [plaintiff] will countermand her social transition, her medical treatment, and all the work she has done with her schools, teachers, and coaches for nearly half her life by introducing herself to teammates, coaches, and . . . opponents as a boy."). The Fourth Circuit has recognized that failure to follow a gender dysphoria treatment plan can have dire medical consequences. *See Grimm*, 972 F.3d at 595 ("Left untreated, gender dysphoria can cause, among other things, depression, substance use, self-mutilation, other self-harm, and suicide."); *Williams v. Kincaid*, 45 F.4th 759, 768 (4th Cir. 2022) ("Failure to follow an appropriate treatment plan [for gender dysphoria] can expose transgender individuals to a serious risk of psychological and physical harm." (citation and internal quotation marks omitted)).

With respect to emotional harm, Janie was "angry," "embarrassed," and "devastated" by the 2023 decision to exclude her from the team. (Janie Decl. ¶ 16; Jill Decl. ¶ 22; John Decl. ¶ 21.) She was particularly upset that she "would not be allowed to play tennis with her friends

21

and represent her school at matches." (Jill Decl. ¶ 22; John Decl. ¶ 21.) Janie cried at the news that the Board revoked her ability to participate on the girls' tennis team in 2023, and her mother reported that it was the "worst moment of [her] life." (Jill Decl. ¶¶ 18, 22.) These harms would likely recur were the Court to uphold the School Board's denial of Janie's renewed application.

With respect to social, dignitary, and financial harms, the Fourth Circuit has recognized that "emotional and dignitary harm . . . is legally cognizable under Title IX and it requires no feat of imagination to appreciate the stigma of being unable to participate on a team with one's friends and peers." *B.P.J.*, 98 F.4th at 563–64 (citing *Grimm*, 972 F.3d at 617–18) (cleaned up). After the School Board prohibited Janie from participating on the girls' tennis team last year, Janie joined a private tennis program that permitted her to play in a manner consistent with her gender identity. (Jill Decl. ¶ 27; John Decl. ¶ 27.) The private tennis program imposed financial and logistical burdens on the Doe family that would not have occurred had she been permitted to play school tennis. (Jill Decl. ¶ 27; John Decl. ¶ 27.) Denying Janie the opportunity to participate on her school team also imposed social harms by isolating Janie from her friends at school who participated on the school team. *See Grimm*, 972 F.3d at 617–18 ("The stigma of being forced to use a separate restroom is . . . sufficient to constitute harm under Title IX[.]").

Defendants' denial of Janie's request to play girls' tennis either denies her the opportunity to play school tennis entirely or demands that she contravene her social transition in order to participate in school athletics. Whether playing on the boys' school team as the only girl or playing in a private league, the Board's policy "invites more scrutiny and attention from other students, very publicly branding" Janie "with a scarlet T." *See Grimm*, 972 F.3d at 617–18 (internal quotation marks omitted). Further, as the Fourth Circuit has explained, "offering [plaintiff] a 'choice' between not participating in sports and participating only on boys teams is

22

no real choice at all." *B.P.J.*, 98 F.4th at 564.  Janie has made a clear showing that the effect of the School Board's Policy is to exclude her from participation in athletics outright because the suggestion that she could compete on the boys' tennis team is "no real choice."  *See id.*[13]

Because Janie Doe faces a litany of harms ranging from medical regression, social isolation and stigma, financial and logistical burdens, and the dignitary harms of either 'outing' her as transgender or communicating that transgender students are not welcomed or encouraged to participate in school athletics at all, Janie Doe has made more than a clear showing that the discrimination has harmed her.

Janie Doe has made a clear showing that she was excluded from participation in an education program "on the basis of sex," that the educational institution was receiving federal financial assistance at the time of the exclusion, and that this improper discrimination caused her harm.  Thus, she has established a likelihood of succeeding on the merits as to her Title IX claim. This showing alone suffices to grant the preliminary injunction she requests.  Nevertheless, in the interest of creating a full record, the Court also considers Janie's likelihood to succeed on her equal protection claim.

---

[13] The Commonwealth of Virginia, as *amicus curiae*, asserts that the application of Title IX to the case at bar would run afoul of the Spending Clause of the Constitution of the United States, because Congress failed to "provide potential recipients of federal education funding with unambiguous notice of the conditions they are assuming when they accept it."  (ECF No. 54, at 12–15); *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 637 (1999) (citation and internal quotation marks omitted).  Because the parties did not raise this argument, the Court declines to consider it.  *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 226 n.4 (2013); *Tafas v. Dudas*, 511 F. Supp. 2d 652, 660 (E.D. Va. 2007) (courts "may not consider legal issues or arguments not raised by the parties" but raised by *amici curiae*).

The Court previously signaled that it would not consider the Commonwealth's Spending Clause argument in the July 31, 2024 Order granting the Commonwealth's Consent Motion for Leave to File Brief as Amicus Curiae, (ECF No. 42).  (ECF No. 53, at 2.)

### b.    __Equal Protection Claim__

Janie also has made a clear showing that she is likely to succeed on the merits of her equal protection claim.  First, Janie has established, and Defendants concede, that the Policy classifies based on transgender status and therefore is subject to intermediate scrutiny.  Second, Defendants have not met their burden to establish that the classification is substantially related to the concededly important interest of fairness in competition for all participants.  Accordingly, at this stage in the litigation, Janie has made a clear showing that she is likely to succeed on her equal protection claim.

### i.    __Legal Standard:  Equal Protection Claim__

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. am. XIV, § 1.  The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  State action "is unconstitutional when it creates arbitrary or irrational distinctions between classes of people out of a bare desire to harm a politically unpopular group."  *Grimm*, 972 F.3d at 607 (4th Cir. 2020) (cleaned up).

Courts considering an equal protection claim "first determine what level of scrutiny applies," and then "ask whether the law or policy at issue survives such scrutiny."  *Grimm*, 972 F.3d at 607; *B.P.J.*, 550 F. Supp. 3d at 353.  The answer to this question turns on what classifications the law creates.  *B.P.J.*, 550 F. Supp. 3d at 353.  The United States Court of Appeals for the Fourth Circuit has determined that policies affecting transgender individuals are subject to "intermediate scrutiny" because such policies "rest[] on sex-based classifications and because transgender people constitute at least a quasi-suspect class."  *Grimm*, 972 F.3d at 607;

*see also B.P.J.*, 98 F.4th at 556 (concluding that intermediate scrutiny was triggered for "two independent reasons," one of which was the "differing treatment of cisgender girls and transgender girls"); *Kadel*, 100 F.4th at 143 ("gender identity is a protected characteristic under the Equal Protection Clause" and thus is "subject to heightened scrutiny").

Because they are subject to intermediate scrutiny, sex-based classifications "fail unless they are substantially related to a sufficiently important governmental interest." *Grimm*, 972 F.3d at 608 (quoting *City of Cleburne*, 473 U.S. at 441) (cleaned up). Put differently, "[u]nder intermediate scrutiny, the government bears the burden of establishing a reasonable fit between the challenged statute and a substantial governmental objective." *B.P.J.*, 550 F. Supp. 3d at 354 (internal quotation marks and citation omitted). When applying intermediate scrutiny to a sex-based classification, the government bears the burden of demonstrating that its proffered justification for its use of the classification is "exceedingly persuasive." *Grimm*, 972 F.3d at 608 (quoting *United States v. Virginia ("VMI")*, 518 U.S. 515, 532–33 (1996) (internal quotation marks omitted)). This is equally true at the preliminary injunction stage because the burdens of heightened equal protection scrutiny at the preliminary injunction stage "track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (citing *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004)).

## ii.     The Policy Discriminates Based on Transgender Status and Triggers Intermediate Scrutiny

Janie has made a clear showing that the Policy discriminates based on transgender status and that this discrimination triggers intermediate scrutiny. On its face, the Policy targets transgender individuals for differential treatment because it considers only "biological sex" in determining a student's participation in school athletics. Policy Manual § 7-4.1. In so doing, the Board "guarantee[s] a particular outcome": that transgender students cannot play on the team

consistent with their gender identity. *See Grimm*, 972 F.3d at 626 (Wynn, J., concurring). As noted above, the Fourth Circuit has held that differential treatment based on gender identity must be justified by intermediate scrutiny. *See B.P.J.*, 98 F.4th at 556, 559. Defendants do not contest that intermediate scrutiny is the appropriate level of scrutiny by which to evaluate Janie Doe's equal protection claim.

### iii.   The Policy Likely Fails Intermediate Scrutiny Because It Is Likely Not Substantially Related to the State's Asserted Interest in Competitive Fairness

The School Board has articulated a single interest[14] justifying its exclusion of Janie from the girls' tennis team: to "ensure fairness in competition for all participants." (September 14, 2023 Letter, at 1.) Janie Doe concedes and the Court agrees that competitive fairness constitutes an important governmental interest. (ECF No. 14, at 27.) Schools have long separated athletics into boys' and girls' teams, and Janie does not challenge this practice. (ECF No. 14, at 27–28.) However, the limited record before this Court demonstrates that a policy of unilaterally excluding transgender students from sports teams that align with their gender identities does not substantially relate to the proffered governmental interest of ensuring fairness in competition.

---

[14] Defendants state that the School Board enacted the Policy "to comply with the 2023 Model Policies, not to specifically exclude transgender students from participating on girls' sports teams." (ECF No. 34, at 11–12.) A state action need not intend to "specifically exclude" the individual to violate the Equal Protection Clause. It is enough that the state action is not "substantially related to a sufficiently important governmental interest." *See Grimm*, 972 F.3d at 607 (quoting *City of Cleburne*, 473 U.S. at 441).

Compliance with a model policy that itself draws an impermissible sex-based classification does not constitute a sufficiently important governmental interest. *See id.* And *B.P.J.* correctly observes that "[f]ederal law trumps state law, not vice versa, and those who violate federal law cannot defend on the ground they were simply following state law." 98 F.th at 553 (citing U.S. Const. art. VI, cl. 2) (internal citation omitted).

As an initial matter, the Board's stated interest is "to fairness in competition *for all participants*." (September 14, 2023 Letter, at 1 (emphasis added).) The Policy is both overbroad and under-inclusive with respect to the stated interest.

First, the Policy is overbroad because it forbids transgender boys from playing on boys' teams, even though any purported athletic advantage would accrue to the cisgender boy athletes in that context. The Board has not explained how a Policy that excludes transgender boys from boys' sports "substantially relates" to "fairness in competition."[15]

Second, the Policy is under-inclusive because it does nothing to ensure fairness in competition for *transgender* student-athletes and in fact directly undermines their ability to compete at all. "[A]ll participants" indisputably includes transgender student-athletes. The Commonwealth's interest in competitive fairness does not allow the Commonwealth to "protect[] one girl's ranking in any competition" or "ensur[e] that cisgender girls do not lose ever to transgender girls." *See B.P.J.*, 98 F.4th at 560. Stated differently, if the Board seeks to "ensure fairness in competition," it must do so for *all* Hanover County students, not just for Hanover County's cisgender students. That the Policy does not even provide an opportunity to compete—much less "ensure fairness in competition"—for Hanover County's transgender students suggests that the Policy is not "substantially related" to the state's asserted interest in competitive fairness "for all participants." *See B.P.J.*, 98 F.4th at 560 ("[L]imiting the beneficiaries of the State's largesse 'begs the question' of whether the challenged classification is justified in the first place" (quoting *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 731

---

[15] Although Janie brings only an as-applied challenge to the Policy, the Court notes this overbreadth with respect to transgender boys as relevant to the assessment of whether the policy is "substantially related" to the important state interest.

n.17 (1982))).  At a minimum, an interest in "fairness in competition for all participants" would itself seem to require that the Board allow Janie a fair chance to compete.

Third, even setting aside the problems of overbreadth and under-inclusivity writ large, Defendants have not persuaded the Court that excluding Janie *in particular* is substantially related to the Commonwealth's interest in competitive fairness.  *See Grimm*, 972 F.3d at 608 (government bears the burden of demonstrating that its proffered justification for its use of the classification is "exceedingly persuasive"); *B.P.J.*, 98 F.4th at 557 ("The Supreme Court has repeatedly held a statute can violate the Equal Protection Clause as applied to some without being facially invalid.").  Janie has presented evidence that "circulating testosterone level" is generally viewed as a more useful indicator of "sex-based differences in athletic performance" than "biological sex."  *B.P.J.*, 98 F.4th at 560; *Hecox v. Little*, 2023 WL 11804896, at *14 (9th Cir. Aug. 17, 2023).  As the Fourth Circuit explained in *B.P.J.*:

> Before puberty, circulating testosterone levels do not vary significantly depending on whether a person has two X chromosomes, one X and one Y chromosome, or some other genetic makeup.  Once puberty begins, however, sex-based differences begin to emerge. . . .  These differences manifest at what medical professionals call the "Tanner 2" stage.

98 F.4th at 560.  In *B.P.J.*, the Fourth Circuit reversed the district court's grant of summary judgment to the government on plaintiff's equal protection claim.  98 F.4th at 555.  The *B.P.J.* court explained that the plaintiff, a transgender girl who received a histrelin implant "at the beginning of [the Tanner 2] stage [of puberty]," had demonstrated a factual dispute over whether she possessed a "meaningful competitive athletic advantage" despite having never undergone the Tanner 2 stage of puberty.  98 F.4th at 559, 560–61.[16]

---

[16] According to Defendants and the Commonwealth as *amicus curiae*, this finding means that Janie has not shown a likelihood to prevail on the merits of her equal protection claim.

In this case, too, Janie has presented evidence that she has never undergone the Tanner 2

stage of puberty because at age nine she received a histrelin implant, which suppresses

endogenous hormones and prevents further development of puberty associated with testosterone.

*See B.P.J.*, 98 F.4th at 560–61; (Jill Decl. ¶ 10; John Decl. ¶ 10; ECF No. 52 ¶ 14).[17]  This

evidence suggests that she has not experienced the physical changes of puberty associated with

testosterone, such as increased circulating testosterone levels, that would tend to give her a

competitive advantage over cisgender girls. *See B.P.J.*, 98 F.4th at 560 (discussing influence of

circulating testosterone on muscle mass and therefore strength and speed).[18]  Thus, "the fact that

---

(ECF No. 34, at 13; ECF No. 54, at 9.)  Their argument improperly assumes that *any* meaningful competitive advantage of transgender girls (on average) as compared to cisgender girls (on average) would necessarily shield the Policy from further scrutiny.  Not so. *See VMI*, 518 U.S. at 533 (the justification for a policy subject to intermediate scrutiny "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females").

The Policy operates exclusively on sex assigned at birth and makes no attempt at an individualized assessment of an individual applicant's actual athletic advantage. *See B.P.J.*, 98 F.4th at 560 (rejecting the notion "that all cisgender girls are entitled to be protected from competition from all transgender girls" and demanding a more individualized inquiry).  Indeed, Defendants never requested such information—much less *any* specific information—from Janie's parents during their review of her application.  The Court finds troubling that the School Board never identified *to the Does during review* the many purported deficiencies of Janie's submission identified in its briefing.

[17] Janie presented evidence that she received this implant at the earliest time the World Professional Association for Transgender Health recommends for transgender youths.  (ECF No. 15-6, at 50 (Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Volume 8*, 23 Int'l J. of Transgender Health S1, S48 (2022)) (recommending that "[t]he adolescent has reached Tanner stage 2 of puberty for pubertal suppression to be initiated").)  This assertion contradicts the Commonwealth's assertion that "Doe has failed to provide any evidence" that she has reached "Tanner 2 stage puberty."  (ECF No. 54, at 10.)

[18] At oral argument, defense counsel argued that Janie has not made the requisite showing because Janie did not submit evidence that her histrelin implant actually functioned as intended, evidence of her pubertal status at the time the histrelin implant was inserted, or evidence of any physical effects of puberty she has or has not experienced.  The Court is unpersuaded.

those who do [have increased levels of circulating testosterone] benefit from increased strength and speed provides no justification—much less a substantial one—for excluding [Janie] from the girls['] [tennis] team[]." *See B.P.J.*, 98 F.4th at 560.  On the record before this Court, the School Board has no information about Janie's circulating testosterone levels or athletic ability (aside from the fact that she made the team last year before Defendants revoked her ability to participate).  A denial of her application to compete without *any* inquiry into her athletic capacity or competitive advantage would seem to spurn rather than to advance the Policy's stated goal of ensuring "fairness in competition *for all participants*." (September 14, 2023, at 1 (emphasis added).)  It falls profoundly short of presenting an "exceedingly persuasive" justification for the use of the sex-based classification. *See VMI*, 518 U.S. at 532–33.

---

Janie must show her entitlement to a preliminary injunction by a "clear showing." *See Perry*, 471 F. App'x at 223 (quoting *Winter*, 555 U.S. at 22).  A "clear showing" does *not* require that Janie prove to the utmost certainty that her medical device did not experience a fluke malfunction, when nothing in the record suggests any reason to suspect that it had.  A "clear showing" does *not* require that Janie hedge against any possibility that—although she received the histrelin implant at *nine years old*, at what her parents attest was the clinically appropriate time for such treatment, (Jill Decl. ¶ 7; John Decl. ¶ 7; *see also* ECF No. 15-6, at 112; ECF No. 15-8, at 3)—she had undergone more of Tanner 2 stage of puberty than her doctors believe that she has.

The record instead suggests Janie has for several years been under the close care and supervision of multiple medical professionals, at least two of whom specialize in transgender care. (Jill Decl. ¶ 7, 9; John Decl. ¶ 7, 9; ECF No. 34-3, at 1 (physician has "provid[ed] gender-affirming care to transgender and gender-diverse youth for over 7 years"); ECF No. 34-5, at 1 (mental health provider "specializes in gender development").)  The Court has no difficulty finding that these medical professionals would have noticed and intervened if her gender-affirming medical care had gone off the rails and was not working as intended.  In the absence of evidence in the record to suggest such derailment, the Court will not entertain implausible hypotheticals.  Janie need not conclusively disprove each of these vanishingly unlikely occurrences, for which no hint of evidence exists in the record, in order to secure a preliminary injunction.

Ultimately, Defendants have not at this stage provided an "exceedingly persuasive" explanation for why the Policy does not consider each transgender student-athlete's individualized circumstances to ensure competitive fairness without barring all transgender students from participating in sports.[19]  *See VMI*, 518 U.S. at 523–33.  That the Policy focuses exclusively on "biological sex" to the exclusion of other characteristics more predictive of athletic advantage (which the parties and case law suggest could include levels of circulating testosterone) illustrates that the policy is not substantially related to the promotion of "fairness in competition for all participants."  *See Hecox v. Little*, 479 F. Supp. 3d 930, 984 (D. Idaho 2020), *aff'd in part, vacated in part, remanded*, 104 F.4th 1061 (9th Cir. 2024) (as amended) ("That the Act essentially bars consideration of circulating testosterone illustrates the Legislature appeared less concerned with ensuring equality in athletics than it was with ensuring exclusion of transgender women athletes.")  The Commonwealth as *amicus curiae* states that "'the existence of wiser alternatives than the one chosen does not serve to invalidate' a policy that 'is substantially related to the goal.'"  (ECF No. 54, at 10 (quoting *Clark ex rel. Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131–32 (9th Cir. 1982)).)  True enough; a wiser alternative will not itself defeat a policy otherwise substantially related to an important state interest.  However, where Defendants have *not* persuaded that the Policy is "substantially related" to the goal, "the existence of wiser alternatives" certainly factor into the analysis of whether the chosen Policy passes constitutional muster.  *See Clark ex rel. Clark*, 605 F.2d at 1131–32.

---

[19] *See supra* (explaining the false choice of suggesting that transgender students play on the team that aligns with their sex assigned at birth rather than their gender identity).

Contrary to Defendants' suggestion, the "required by law" exception to the Policy does not solve these problems. That the Policy allows for exceptions only as "required by law" is tautological because no policy can be applied in a way that violates the law. Nor does the exception make the Policy any less discriminatory for equal protection purposes: the Policy still singles out transgender students based solely on the incongruence between their gender identity and their sex assigned at birth, with no provision for individualized assessment of purported athletic advantage.

Janie has shown her likelihood to succeed on her equal protection claim because the School Board failed to meet its burden of demonstrating that its sex-based classification of sex assigned at birth is substantially related to its proffered justification of "fairness in competition for all participants." The Board's failure rings especially true in the case at bar, where it is undisputed that Janie began gender dysphoria treatment at age 7, attended school as a girl since the third grade, received a Commonwealth-issued birth certificate reflecting her sex as female, legally changed her name, and received a histrelin implant at the age of nine that suppresses her endogenous hormones, testosterone, and prevents further development of puberty associated with testosterone. (ECF No. 52 ¶¶ 4–6, 12–14.)

## 2.  Janie Doe Faces a Likelihood of Irreparable Harm

Janie Does has demonstrated by a clear showing that she faces a likelihood of irreparable harm absent injunctive relief. *See Winter*, 555 U.S. at 22. Courts routinely find that violations of Title IX constitute irreparable harm. *Doe v. Wood Cnty. Bd. of Educ.*, 888 F. Supp. 2d 771, 777 (S.D. W. Va. 2012) (additional citations omitted). For equal protection claims, courts presume irreparable harm when a claim is based upon a violation of plaintiff's constitutional rights. *Ross*

*v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) ("[T]he denial of a constitutional right . . . constitutes irreparable harm for purposes of equitable jurisdiction.").

Janie has only three years in middle school—and, given Defendants' rejection of her application last year, only two years left in which she could possibly play school tennis. *See Doe*, 888 F. Supp. 2d at 778 (noting that plaintiffs "will experience their middle school years only once during their life"). Continued exclusion from participation in school sports will deny Janie "sport and fellowship . . . [and] opportunities to build camaraderie and team-building skills at a critical point in her adolescent development." (ECF No. 14, at 31.)

Finally, denial of Janie's ability to participate based solely on her gender identity will subject Janie to the state's "moral disapproval" of her identity. *See Lawrence v. Texas*, 539 U.S. 558, 582–83 (2003) (O'Connor, J., concurring). Defendants' actions would exacerbate "'[t]he stigma of being' unable to participate on a team with one's friends and peers." *See B.P.J.*, 98 F4th at 563–64 (quoting *Grimm*, 972 F.3d at 617–18). Social, psychological, and emotional harms resulting from that discrimination constitute "[d]ignitary wounds [that] cannot always be healed with the stroke of a pen." *Obergefell v. Hodges*, 576 U.S. 644, 678 (2015). Janie has already experienced psychological harm from being singled out by the School Board for disparate treatment based on her gender identity. (Janie Decl. ¶¶ 13, 16; Jill Decl. ¶¶ 18, 22; John Decl. ¶¶ 17, 21.)

Because the Court concludes that Janie has demonstrated a likelihood of prevailing on the merits of her Title IX and equal protection claims, she has necessarily shown irreparable harm. *See Wood Cnty. Bd. of Educ.*, 888 F. Supp. 2d at 777 (violations of Title IX constitute irreparable harm); *Ross*, 818 F.2d at 1135 ("denial of a constitutional right . . . constitutes irreparable harm for purposes of equitable jurisdiction"). Defendants' arguments that Janie has not shown

irreparable harm relied on Defendants' standing, ripeness, and merits arguments, which the Court has already rejected for the reasons discussed *supra*. (ECF No. 34, at 13–14.)

### 3. The Balance of the Equities and the Public Interest Favor Preliminary Injunctive Relief

Janie has demonstrated by a clear showing that the balance of the equities and the public interest favor preliminary injunctive relief. *See B.P.J.*, 550 F. Supp. 3d at 357 ("Where, as here, the government is a party, the 'balance of the equities' and 'public interest' prongs of the preliminary injunction test merge." (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009))). Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks omitted).

Regarding Janie's injury, Defendants' decision to exclude Janie from girls' tennis has deprived her, and will continue to deprive her, of opportunities to bond with her classmates, build important skills, and otherwise benefit from all the opportunities that team sports entail.[20] (Jill Decl. ¶ 26; John Decl. ¶ 26.)  The decision also will cause her pain, distress, and feelings of exclusion and ostracization.  (Janie Decl. ¶¶ 16–17; Jill Decl. ¶¶ 18, 22; John Decl. ¶¶ 17, 21.) Because Janie suffers from gender dysphoria, the School Board's decision to exclude her from

---

[20] *See* Malm et al., *Physical Activity and Sports—Real Health Benefits:  A Review with Insight into the Public Health of Sweden*, 7 Sports 1, 13–14 (2019) (participation in organized youth sports fosters a more active lifestyle as an adult, which in turn reduced morbidity and mortality); *see also* Lumpkin & Favor, *Comparing the Academic Performance of High School Athletes and Non-Athletes in Kansas in 2008–2009*, 4 J. Sports Admin. & Supervision 41, 57 (2012) (correlation between interscholastic athletic participation and academic performance); Findlay & Coplan, *Come Out and Play:  Shyness in Childhood and the Benefits of Organized Sports Participation*, 40 Can. J. Behav. Sci. 153, 158–59 (2008) (children who participated in sport had higher levels of self-esteem and reduced social anxiety); Steiner et al., *Adolescents and Sports:  Risk or Benefit?*, 39 Clinical Pediatrics 161, 163–64 (2000) (students who played sports had fewer mental and physical health problems)

the girls' tennis team will improperly deprive her of opportunities to affirm her gender identity and will undermine her social transition. (*See* Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1, S52–S53 (2022) ("Rejection by family, peers, and school staff . . . was strongly linked to negative outcomes, such as anxiety, depression, suicidal ideation," and self-harm); Jill Decl. ¶ 25; John Decl. ¶ 25.)

Conversely, a preliminary injunction would not harm Defendants. The sole harm that Defendants identify in their briefing is what the United States Court of Appeals for the Eighth Circuit has called the "needless friction with state policies" that Defendants assert *would have* occurred had the Court ruled on the preliminary injunction prior to the School Board's August 13, 2024 meeting. (ECF No. 34, at 14–15 (quoting *Dixon v. City of St. Louis*, 950 F.3d 1052, 1056 (8th Cir. 2020)).) Because the Court heard oral argument and issued this opinion after the August 13, 2024 hearing, Defendants' argument is moot.

Finally, "upholding constitutional rights" surely serves the public interest. *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013) (en banc) (internal quotation marks omitted). One is hard put to identify an instance where upholding constitutional rights does *not* serve the public interest. "[C]ompliance with Title IX," an important and longstanding federal civil rights statute, also serves the public interest. *Doe*, 888 F. Supp. 2d at 778; *Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 729 (4th Cir. 2016) (Davis, J., concurring) ("Enforcing [plaintiff's] right to be free from discrimination on the basis of sex in an educational institution is plainly in the public interest."), *vacated and remanded on other grounds*, 580 U.S. 1168 (2017). Defendants' decision and the School Board's Policy contravene the strong public interest in educational institutions being free of discrimination of all kinds, including on the basis of gender

identity.  Although it is true that "the equities favor maintaining the status quo," (ECF No. 34, at 15 (citing *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024))), the principle is not absolute and must on occasion give way, as when the status quo violates constitutional rights and federal civil rights statutes.  The Court concludes that this final factor weighs strongly in favor of granting the requested relief in order to uphold Janie Doe's rights under Title IX and the Constitution.

### IV.  Scope of Injunctive Relief

Having concluded that Janie Doe is entitled to a preliminary injunction, the Court must "consider the proper scope of the imposed restraint." *API Tech Servs., LLC v. Francis*, No. 4:13cv142 (ALWA), 2013 WL 12131381, at *4 (E.D. Va. Dec. 4, 2013) (citing *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 894 F. Supp. 2d 691, 710 (E.D. Va. 2012), *vacated and remanded on other grounds*, 564 F. App'x 710 (4th Cir. 2014)).  "[I]t is well established . . . that a federal district court has wide discretion to fashion appropriate injunctive relief in a particular case." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (citation and internal quotation marks omitted).  "Still, a court should mold its decree to meet the exigencies of the particular case." *Id.* (citation and internal quotation marks omitted).  "And a court must ensure a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Id.* (citation and internal quotation marks omitted).

The Court will enjoin Defendants from enforcing against Janie Doe Hanover School Board Policy § 7-4.1 and any other law, custom, or policy that prohibits Janie Doe's participation on girls' school sports teams in Virginia.  Janie Doe will be permitted to try out for, and if selected to play on, her middle school's girls' tennis team.  For purposes of this ruling, the

injunction applies only to Janie Doe, only to the tennis team, and only to the 2024–2025 school year. These restrictions are "mold[ed] . . . to meet the exigencies of the particular case" and "ensure [that the] preliminary injunction is no more burdensome to the defendant[s] than necessary to provide complete relief to the plaintiff[]." *See Roe*, 947 F.3d at 231.

## V.  Conclusion

Janie is an eleven year old girl whose gender identity displayed as differentiated from her sex assigned at birth from as early as three years old. The Commonwealth of Virginia issued a birth certificate identifying her female gender when she was seven or eight years old. By the third grade, she comfortably attended school as a girl. She has been treated for gender dysphoria by medical doctors for years, and her histrelin implant at age nine clearly shows that blockers against male puberty hormones were commenced at a medically appropriate time. As such, Janie Doe has demonstrated a likelihood of success on the merits of both her Title IX and Equal Protection Clause claims.

With respect to her Title IX claim, Janie has demonstrated a likelihood of showing that she was excluded from participation in girls' tennis on the basis of sex and that she was harmed as a result. With respect to her equal protection claim, Janie has demonstrated a likelihood of showing that the challenged policy fails intermediate scrutiny because it is not substantially related to the important governmental interest of ensuring "fairness in competition for all participants." (*See* September 14, 2023 Letter, at 1.)

Second, she has demonstrated that she faces a likelihood of irreparable harm without the preliminary injunction due to the medical, emotional, social, financial, and dignitary harms that flow from a public rejection of Janie's gender identity and her inability to access the benefits of athletics through her public school.

Third, the balance of the equities and the public interest favor preliminary injunctive relief because Janie has demonstrated a likelihood of showing a violation of her federal statutory and constitutional rights to be free from discrimination, and Defendants face no countervailing harm in allowing a limited exception for Janie to play on the girls' tennis team this year while the case pends.  Accordingly, Janie Doe has established entitlement to preliminary injunctive relief.

For the foregoing reasons, the Court will grant the Motion.  (ECF No. 13.)  While this case pends, the Court will enjoin Defendants from enforcing against Janie Doe the Hanover School Board Policy § 7-4.1 and any other law, custom, or policy that prohibits Janie Doe's participation on the girls' tennis team at her middle school.  Janie Doe will be permitted to try out for—and if selected, to play on—her middle school's girls' tennis team for the 2024–2025 school year.

The Court finds that a bond is unnecessary and waives its requirement in this case.  *See B.P.J.*, 550 F. Supp. 3d at 357.[21]  *See* Fed. R. Civ. P. 65(c).

An appropriate Order shall issue.

Date: 8/16/2024
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge

---

[21] "Where the district court determines that the risk of harm [to the enjoined party] is remote, or that the circumstances otherwise warrant it, the court may fix the amount of the bond accordingly.  In some circumstances, a nominal bond may suffice." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999).  This bond can even be waived entirely when the defendant would not suffer any harm from the injunction. *Citizens for a Responsible Curriculum v. Montgomery Cnty. Pub. Sch.*, No Civ. A. AW-05-1994, 2005 WL 1075634, at *12 (D. Md. May 5, 2005).